# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | | |
|---|---|---|
| KELLYE CROFT, Plaintiff, v. HARVEY WEINSTEIN and JAMES DOLAN, Defendants. | : | Index No.: Plaintiff designates NEW YORK COUNTY as the place of trial **SUMMONS** The basis of the venue is: C.P.L.R. § 503(a) |

To the above-named Defendants:

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance on counsel for Plaintiff within twenty (20) days after service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: September 18, 2026
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: ______________________
Douglas H. Wigdor
Meredith A. Firetog

85 Fifth Avenue
New York, New York 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
mfiretog@wigdorlaw.com

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**LAW OFFICE OF KEVIN MINTZER, P.C.**

Kevin Mintzer
Laura L. Koistinen

1350 Broadway, Suite 1410
New York, New York 10018
Telephone: (646) 843-8180
km@mintzerfirm.com
llk@mintzerfirm.com

*Counsel for Plaintiff*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

To: Harvey Weinstein
Outposted Therapeutic Housing Unit at Bellevue
New York City Department of Correction
462 1st Avenue,
New York, NY 10016
summons.service@doc.nyc.gov
Lavarra.barnett@DOC.nyc.gov

James Dolan
Madison Square Garden Entertainment Corp.
2 Pennsylvania Plaza,
New York, NY 10121



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | | |
|---|---|---|
| KELLYE CROFT, Plaintiff, | : | Index No.: |
| v. | : | |
| HARVEY WEINSTEIN and JAMES DOLAN, Defendants. | : | **VERIFIED COMPLAINT** |
| | : | **Jury Trial Demanded** |

Plaintiff Kellye Croft ("Plaintiff" or "Ms. Croft"), by and through her undersigned counsel, Wigdor LLP and the Law Office of Kevin Mintzer, P.C., in her Verified Complaint against Defendants Harvey Weinstein ("Weinstein") and James Dolan ("Dolan") (together, "Defendants"), hereby alleges as follows:

## PRELIMINARY STATEMENT

1. James Dolan, the billionaire chairman of Madison Square Garden, claimed shock and surprise when his good friend Harvey Weinstein was outed as a habitual predator of young women.

2. In an appearance on a morning news show, Dolan claimed complete ignorance of his former friend's track record of abuse, stating: "Um, you know, I wonder — and I've actually talked to a lot of my other friends who obviously know all these folks, right? — I wonder what could I have done? What did I miss?"

3. The reality, however, is that Dolan did not "miss" anything about his friend's Weinstein's abuse. Indeed, Dolan not only knew about it, but facilitated and enabled Weinstein's assault of a young woman named Kellye Croft.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

4. In 2013, Ms. Croft was a 27-year-old licensed massage therapist who had her first big career break when she was hired by Glen Frey ("Frey"), the lead singer of the infamous rock band, the Eagles, to join the band on tour.

5. At the time, Ms. Croft had never even heard of James Dolan and did not remotely understand how deeply involved Dolan was in the tour she was hired to join.

6. She did not know, for example, that Dolan and Eagles manager Irving Azoff ("Azoff") were close friends and business partners, and that hundreds of millions of dollars were flowing between Azoff and Dolan's corporations as part of the Eagles tour and related re-opening of the historic concert venue, the LA Forum. Dolan's financial dealings allowed him to place his mediocre vanity project band, JD & the Straight Shot, as the opening act for the Eagles.

7. When Ms. Croft met Dolan, she was quickly intimidated by his authority and power over the tour. For instance, Dolan told Ms. Croft he would "take care of" an issue she had with another member of the tour; soon thereafter, that other tour member was fired and Frey personally apologized to Ms. Croft.

8. With the backdrop of this power imbalance, Dolan himself engaged in sexually inappropriate behavior with Ms. Croft when he physically forced himself onto her during a professional massage session in Miami.

9. Dolan continued this unwanted sexual intercourse with Ms. Croft in California, during another leg of the Eagles tour. Despite the Eagles not needing Ms. Croft's services, Dolan requested that she be transported to the tour and housed in the same hotel as Dolan and his band. In doing so, Dolan successfully isolated the young vulnerable massage therapist and set in place the continuation of his prior unwanted sexual interactions with Ms. Croft.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

10. And further, Dolan used the opportunity of isolating Ms. Croft to set her up for his good friend Harvey Weinstein's sexual gratification. After a harrowing assault by Weinstein in her hotel room, Ms. Croft told Dolan what had happened.

11. In response, Dolan did not ask what he "could have done" or what he "miss[ed]" about his dear friend. Instead, he acknowledged that he already knew of the problem. Dolan told Ms. Croft that "we all know" that Weinstein was a "troubled person" who "has problems," and insisted that "his friends" were trying to get him "help."

12. And instead of asking himself at that time what he could do to prevent future harm or even confront his friend, less than two years later, Dolan joined the board of Weinstein's company, The Weinstein Company, serving in a fiduciary capacity towards the shareholders of a company that Dolan knew was run by a habitual sexual predator.

13. Incredibly, despite Dolan's professed knowledge about Weinstein's proclivities and problems—knowledge he had both before and after Weinstein's assault of Ms. Croft—Dolan continued to feign ignorance of those facts, misleading others by writing a song claiming he "should have known" what he knew all along.

14. After over a decade of contending with the trauma caused by Dolan and Weinstein and seeing the ways in which these powerful men have shielded themselves from true accountability, Ms. Croft now seeks justice for what they did to her and the long-lasting harm they caused.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over Defendants pursuant to Civil Practice Law & Rules ("CPLR") § 301 because Defendant Weinstein, upon information and belief, resided in the County of New York prior to his incarceration, and because Defendant Dolan lives and works in New York.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

16. Venue is proper pursuant to CPLR § 503(a) because Defendant Weinstein, upon information and belief, resided in the County of New York prior to his incarceration, and because Defendant Dolan's principal place of business is in the County of New York.

## PARTIES

17. Plaintiff Kellye Croft is a 39-year-old woman and is a resident of the State of Tennessee.

18. Defendant Harvey Weinstein is, on information and belief, a citizen of the State of New York and presently is incarcerated at the Mohawk Correctional Facility in Rome, New York.

19. Defendant James Dolan is, on information and belief, a citizen of the State of New York.

## FACTS

### I. Ms. Croft Joins The Eagles on Tour

20. Kellye Croft was born and raised in Tennessee, and by her mid-twenties, had achieved success in her dream career as a Licensed Massage Therapist with her own small studio. She earned her license in 2007 after completing 750 hours of schooling, and had established regular business with Bridgestone Arena, working on Cirque du Soleil tours and with individuals connected to the country music scene in Tennessee.

21. In the fall of 2013, she was presented with what she believed was her big break, and the opportunity of a lifetime—to serve as the massage therapist for Glenn Frey of the legendary rock band, the Eagles, on their tour, "History of the Eagles – Live in Concert."

22. For Ms. Croft, this was an unprecedented opportunity, and her friends and family were incredibly proud. At the same time, Ms. Croft was intimidated by the offer to travel across



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

the country with a world-famous rock band: she had not traveled extensively before, had never lived on her own, and had never spent more than a few nights away from her family.

23. After a few shows with the Eagles in October 2013, Ms. Croft was thrilled when Tom Golseth ("Golseth"), the Eagles' tour manager, reached out to her to see if she would be available to join the band on tour in North Carolina, Alabama, and Florida in November. She gladly accepted the position, and the band arranged for Ms. Croft's massage table to be transported with the band.

24. While traveling with the band was an exciting experience, Ms. Croft was also overwhelmed. This was particularly true because she did not know anyone else on the tour, and therefore felt extremely isolated.

25. The experience became even more lonely and stressful for Ms. Croft when she got into a disagreement with Golseth, who she felt had inappropriately chastised her and embarrassed her in front of other tour members.

## II. Ms. Croft Meets Dolan and Is Lured Into Unwanted Sexual Contact

26. In addition to serving as Frey's masseuse, tour management gave Ms. Croft permission to open up massage slots for others on the tour, and she did her best to help and accommodate others who requested her services.

27. During the November 2013 leg of the tour, Ms. Croft regularly shared her business card with others backstage, both to generate business and to counteract the profound sense of isolation she felt while traveling with the band.

28. On one occasion, she shared her card with James Dolan, the lead singer of the band opening for the Eagles, JD & The Straight Shot. Ms. Croft had never heard of Dolan, and when she met him, did not know the immense wealth, power, and influence he had. She later came to



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

understand that Dolan was in multiple business ventures with the Eagles' management company, Azoff Music Management, and heard that Dolan was a long-time business partner and significant funder of Irving Azoff's businesses and of the tour itself, which allowed him to place his mediocre band as the opening act.[1]

29. Days after her disagreement with Golseth, Dolan scheduled a massage with Ms. Croft. Given her unfamiliarity with Dolan, she did not think much of the appointment—in fact, she was extremely distracted, as the appointment fell within days of the disagreement with Golseth and others on the tour were discussing the incident and her involvement.

30. Dolan noticed how upset Ms. Croft was, and he asked her to explain what was wrong. She explained what had happened, and Dolan responded to her stating, "I will make sure this is taken care of." Ms. Croft dismissed her massage client's statement, not recognizing how much power and influence Dolan had over others on the tour.

31. Ms. Croft did not know, for example, that Dolan was extremely close friends with Irving Azoff, who, through his company, was the music manager for both the Eagles and JD & The Straight Shot.

---

[1] *See* Marc Schneider, *MSG's James Dolan Opens for Eagles, Pens Songs About Eliot Spiter & Trayvon Martin,* Billboard (Sept. 12, 2014), https://www.billboard.com/pro/james-dolan-eagles-madison-square-garden/ (last accessed September 11, 2026) (noting that Dolan "has secured his own band to warm up the crowd" for an Eagles show in NYC, and explaining that "The Dolan-Eagles connection is a strong one. They share a manager in Irving Azoff and Eagles guitarist Joe Walsh has worked with the Straight Shot in the studio"); *see also* Scott Cacciola, *The Man in the Middle*, N.Y. Times (March 24, 2014), https://www.nytimes.com/2014/03/25/sports/basketball/the-man-in-the-middle-of-the-knicks-deal-with-jackson.html (last accessed Sept. 11, 2026) ("Enter Azoff, who has been business partners with Dolan since 2004, when Dolan began investing in Azoff's management company. (Dolan and Madison Square Garden have since poured millions more into other Azoff ventures.) They speak on the phone several times a day, Azoff said, and spend time together socially. It was at a party in December, at Azoff's home in the exclusive Holmby Hills section of Los Angeles, that Dolan and Jackson retired to a downstairs office so they could discuss the Knicks. It was all a part of Azoff's plan.").



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

32. At some point after Dolan's statement to Ms. Croft that he would take care of her predicament, Frey called Ms. Croft and apologized repeatedly and profusely to her for the situation with Golseth. Ms. Croft found this behavior extremely out of character for Frey.

33. She thereafter learned that the Eagles fired Golseth from the tour, and rumors spread that the incident between Ms. Croft and Golseth was the reason for the sudden termination. Upon information and belief, Golseth was fired by Irving Azoff at Dolan's direction and insistence.

34. In mid-November 2013, Ms. Croft joined the band in Miami for another part of the Eagles tour. Unfortunately, Ms. Croft continued to feel ostracized by others because of Golseth's firing and was even more isolated than before.

35. During this trip, Dolan scheduled his second massage with Ms. Croft. Dolan asked Ms. Croft how the situation concerning Golseth had evolved, and Ms. Croft noted that Frey had apologized to her and that she hoped things would get better, although noted that she still felt isolated. Dolan responded, "I told you it would be taken care of," thereby insinuating that he was the one who caused Frey to apologize to her.

36. At that moment, Ms. Croft began to understand the power Dolan had on the tour—he was even able to get Frey to apologize to her.

37. Ms. Croft also understood that Dolan could control the business decisions about the Eagles tour. For example, Dolan once suggested that Ms. Croft should "travel the world" and join the Eagles when the band traveled to Europe for a continuation of the tour. Ms. Croft had not previously discussed the European leg of the tour with anyone from the band's management, but Dolan assured her that he would make sure she would be invited to Europe, demonstrating that he could control decision-making about the tour.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

38. At that same time, in the context of Ms. Croft's professional massage of Dolan, he felt emboldened to further flex his power and influence over Ms. Croft. Towards the end of the massage, Dolan pulled Ms. Croft towards him. She tried to push away, stating that she was very uncomfortable and that she took her job as a Licensed Massage Therapist very seriously and that she wanted to remain professional.

39. Ms. Croft tried to bring the massage to an end, but Dolan proceeded to come on even stronger, treating Ms. Croft's resistance as part of a challenge or a game.

40. Dolan then grabbed Ms. Croft's hands, dragging her to a couch in the same room and forcing her hands between his knees as he sat down. Ms. Croft was adamant that she did not want to have any sexual interactions with Dolan, who was married at the time and over thirty years older than Ms. Croft.

41. Dolan was extremely assertive, and pressured Ms. Croft into unwanted sexual intercourse with him. She felt disgusted and terrified of the situation, but the extreme isolation she felt from others on the tour, coupled with Dolan's attention to her, his assertions that he would take care of her, and her recognition that this man held immense power over everyone's position on the tour—including hers—led her to submit to Dolan's advances.

42. Following this unwanted sexual contact, Ms. Croft was summoned to Dolan's room multiple times during the remainder of that part of the tour. On each of these occasions, Dolan made unwelcome advances toward Ms. Croft, and just as she did the first time, she felt obligated to submit to sex with him each time he initiated contact.

43. Dolan was extremely manipulative, constantly reminding Ms. Croft of the way he "fixed" the situation with Golseth for her. He would also regularly name-drop famous celebrities and sports stars he said were his friends. He also suggested that Ms. Croft would have



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

opportunities for more work through him, noting that as the owner of Madison Square Garden, many musical tours went through that venue and required massage services. Although Dolan claimed to be sober, Ms. Croft saw multiple bottles of Valium and Ambien in Dolan's possession.

44. Ms. Croft was disgusted by Dolan, but her youth and extreme loneliness while on the road with strangers, as well as Dolan's immense power, made it possible for Dolan to manipulate Ms. Croft and lure her under his control.

## III. <u>Dolan and Others Transport Ms. Croft to California</u>

45. Around the end of 2013, Ms. Croft received a request to join the tour in Los Angeles, California.

46. Although Ms. Croft understood that she was being flown out to California to work for the Eagles and Frey, she later learned that she was working for both the Eagles and Dolan. A member of the tour forwarded Ms. Croft an email that suggested her flight to California would be expensed on "the JD credit card." On information and belief, "JD" referred to James Dolan and/or JD & The Straight Shot.

47. Ms. Croft thought it was strange that she was invited to Los Angeles, as normally when the Eagles were in a major city, the band members were too busy to schedule massages with her. Frey also lived in California and had another masseuse on call in Los Angeles, so Ms. Croft was not needed. Nevertheless, Ms. Croft was grateful for the work and accepted the invitation.

48. Ms. Croft had no reason to believe she would not be working for the Eagles on this tour. In booking her travel, the tour manager told her that "I'll need you at the show Monday afternoon. We will make arrangements for you." Additionally, Ms. Croft received an email from the Eagles' assistant tour manager in advance of her trip stating that she was "excited to hear that



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

we'll get to see you soon." As a result of her communications with representatives of the Eagles, she understood and believed that she would be joining the Eagles on tour, as she had in the past.

49. Ms. Croft's understanding was bolstered by the fact that the Eagles tour manager personally transported Ms. Croft from The Peninsula to The Forum on days when shows were scheduled.

50. At the time, Ms. Croft did not know that JD & The Straight Shot and Dolan would be opening for the Eagles on this part of the tour.

51. On all prior legs of the Eagles tour, Ms. Croft understood that the Eagles paid for her travel and lodging. Because Dolan or his band was paying for Ms. Croft's presence on the Los Angeles tour stint, the Eagles tour members must have known that Ms. Croft's presence was specifically requested by Dolan.

52. Ms. Croft also did not realize at the time the deep connections between the corporate management of the Eagles and James Dolan. In September 2013, Dolan's MSG paid $125 million to a company run by Eagles' manager Irving Azoff in exchange for a 50% stake in a joint venture partnership, Azoff MSG Entertainment LLC. The joint venture was specifically created to fund the renovation and reopening of The Forum, the historic music venue in Los Angeles. The venue's first tour upon reopening in January 2014 was the Eagles, with JD & The Straight Shot performing as the opening act.[2]

[2] Indeed, on December 21, 2013, Azoff and his wife Shelli sent an email invitation to the opening of The Forum, which specifically acknowledged that the venue remodeling was done jointly with Dolan: "We are delighted to extend the attached invitation from the two of us, along with Jim Dolan, for you and a guest to attend what promises to be a once in a lifetime evening, celebrating the re-opening the newly remodeled Los Angeles Forum." *See* https://wikileaks.org/sony/emails/emailid/56721 (last accessed April 10, 2024).



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

53. Indeed, Ms. Croft did not realize that the only reason Dolan was opening for the Eagles was because of his monetary investments in Azoff's companies and, specifically, in The Forum. As one article described Dolan's path to establishing his band,

> Dolan hit up powerful friends who'd offered to help. Azoff took over management of Dolan's band. He accepted an invitation from [Eagles band member Joe] Walsh, an Azoff client, for JD & the Straight Shot to open shows, including a date in August 2007 at the Beacon Theater, which MSG had acquired at the end of the previous year. Don Henley—the drummer and face of the Eagles, and Azoff stablemate—also brought the band on as a warm-up act. While serving as the Eagles' opener, JD & the Straight Shot got to be the first band to play the refurbished L.A. Forum, which Dolan's company had acquired two years earlier. The Azoff connection likewise landed JD & the Straight Shot several stadium dates on a one-of-these-things-is-not-like-the-other-ones cavalcade tour in 2010 with the Eagles, Keith Urban, and the Dixie Chicks.[3]

54. Although Ms. Croft was unaware of the financial transactions that led to Dolan's participation in the tour, Dolan controlled the purse strings as it related to the re-opening of The Forum, and he thus had profound power over everyone involved in the venue and the tour—including Ms. Croft.

55. When Ms. Croft arrived in Los Angeles, the Eagles management arranged for Ms. Croft to be picked up at the airport by a security guard for the Eagles, who Ms. Croft knew from previous shows. The security guard brought her to stay at The Peninsula Hotel in Beverly Hills. Although the arrangements up until that point were typical of the other tour stints she had joined with the Eagles, she soon became aware that the trip to Los Angeles was very different. Unlike the other tour stints that she joined with the Eagles, for example, Ms. Croft was not housed at the same hotel as the band and the other tour support staff; instead, she was at the same hotel as Dolan and JD & The Straight Shot.

---

[3] Dave McKenna, *James Dolan Wants You to Love His Band*, Deadspin (May 5, 2016) https://deadspin.com/james-dolan-wants-you-to-love-his-band-1774444500 (last accessed September 11, 2026).



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

56. On all other tour stints, Ms. Croft traveled and ate her meals with Frey and the Eagles, was provided with a hotel room paid for by the Eagles management that was located very close to Frey's room, traveled to and from the venue with Frey, and was provided compensation exclusively from the Eagles management for her work with the Eagles. By contrast, in Los Angeles, Ms. Croft barely saw Frey or the other members of the Eagles.

57. Ms. Croft was given a room to perform massages at The Forum, the newly re-opened venue funded by Irving Azoff and James Dolan. Ms. Croft spent the majority of the time in Los Angeles by herself in the room at The Forum. Almost no tour members signed up for massage appointments.

58. Ms. Croft did not perform a single massage on any member of the Eagles while working at The Forum, despite ostensibly being flown to California for that very purpose, and even though she later received "venue pay" from the Eagles management.

59. Although the Eagles management purported to fly Ms. Croft from Tennessee to California to perform legal massage services for the Eagles and other tour members, in reality, Ms. Croft was flown out to Los Angeles, at Dolan's direction and request, for the purposes of engaging in unwanted sexual acts with Dolan.

60. Indeed, Dolan expected Ms. Croft to have sexual interactions with him during the tour, and she spent her time either isolated by herself or waiting for instructions from Dolan.

61. On evenings when there was no show scheduled at The Forum, Ms. Croft would stay alone in her room at the Peninsula until she was inevitably called to Dolan's room for a "massage" or to "work on [him.]" On these occasions, Dolan never truly wanted only a massage, but expected sexual favors.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

62. Ms. Croft did not want to have sexual and intimate contact with a man twice her age whom she did not find remotely attractive. But given Dolan's power, she was terrified of upsetting him by rejecting his sexual demands. She understood that doing so would jeopardize her work with the Eagles and future opportunities to serve as a Licensed Massage Therapist for professional musicians. She also knew that when she had resisted Dolan's advances in Miami, he grabbed her hands and forced himself on her; she believed he could do so again, and that he would do so again, if she similarly resisted. Thus, Ms. Croft's submission to Dolan's sexual demands, which included him touching Ms. Croft's breasts, buttocks and vagina, was neither free nor voluntary, and was against Ms. Croft's will.

63. Beyond his own actions towards Ms. Croft, Dolan also led others to believe that Ms. Croft was an easy target for sexualized behavior. On one occasion, Ms. Croft was summoned to Dolan's hotel room for a supposed "massage." Once in his room, Dolan shared that he and "the band" (meaning his JD & The Straight Shot bandmates) had together gone to an adult entertainment store where Dolan had purchased a vibrating sex toy for Ms. Croft. He told her that he bought it for her because she had previously discussed with him the practice of using vibrations on vocal cords for massages for vocalists like the musicians she worked with. When Ms. Croft explained that the device she had referred to was a specific professional massage tool, Dolan then suggested the two use the sex toy he purchased for sexual activity.

64. Ms. Croft was humiliated—first, because Dolan had made a mockery of the massage practices that she had devoted her career to and took extremely seriously, and second, because it was clear that Dolan had told his friends and bandmates that he was purchasing a sex toy *for her*, leaving no question that others on the tour knew that Dolan was having sexual contact with Ms. Croft.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

65. By disclosing his illicit activities with Ms. Croft to his bandmates, Ms. Croft believes that Dolan also gave the impression to others on the tour that Ms. Croft was available to provide sexual services. For example, JD & The Straight Shot band member Brian Mitchell signed up for a massage with Ms. Croft. When in the massage room, Mitchell asked Ms. Croft if she would provide him with a "prostate massage." At the time, Ms. Croft did not know what that meant, and she told Mr. Mitchell that she wasn't familiar with what he was asking for but would do some research. Ms. Croft subsequently determined that Mitchell was asking for a sexual favor, not a legitimate massage. On information and belief, Dolan's bandmate believed that Ms. Croft would engage in sexual contact because Dolan had suggested that she was available for sexual favors.

## IV. Dolan Fraudulently Coordinates a Meeting Between Ms. Croft and Harvey Weinstein

66. A few days into this leg of the tour, on January 21, 2014, Dolan encouraged Ms. Croft to join two female assistants from the Eagles management, including a woman named Jillian Lentz,[4] for shopping and dinner in Los Angeles. After shopping for clothes, the three women had dinner at a burger restaurant. Ms. Croft was nervous and uncomfortable around these two strangers.

67. When she returned to the Peninsula, she waited for the elevator to her floor next to a large man she had never seen before while holding her shopping bags and a box of leftover food. When the elevator arrived, Ms. Croft and the man entered the elevator together.

---

[4] According to Ms. Lentz's LinkedIn profile, she worked for Azoff Music Management from October 2013 through February 2015. *See* https://www.linkedin.com/in/jillianlentz/details/experience/ (last accessed September 11, 2026).



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

68. In the elevator, the large man asked Ms. Croft, "who is that to-go box for?" She responded that she was going to give it to her friend James Dolan, who was also staying at the hotel.

69. The man responded to Ms. Croft that Dolan was "one of his best friends," and proceeded to ask Ms. Croft if she was "the massage therapist." According to the man, Dolan had mentioned his massage therapist and had said great things about her. He introduced himself as Harvey Weinstein.

70. Ms. Croft did not know much about Weinstein other than what she had heard from Dolan himself, who had boasted about having a "buddy" who worked on all the cool movies in Hollywood.

71. In the elevator, Weinstein suggested that he might have work opportunities for Ms. Croft, stating that "we always need massage therapists on set for actors and actresses." He asked Ms. Croft if she would be interested in such an opportunity.

72. Ms. Croft was stunned by the offer and said that she would be happy to discuss such a role.

73. Weinstein suggested that they discuss the job opportunity immediately, and he insisted that Ms. Croft join him in his suite to continue the conversation.

74. Ms. Croft's hotel room was near Weinstein's. Because she had no other obligations that evening, she agreed to join Weinstein to discuss what sounded like a dream job opportunity.

75. After entering Weinstein's suite, Ms. Croft sat down on a couch in the living room area and set down her to-go box and shopping bags near her. Weinstein nodded towards Ms. Croft's shopping bags and told her that she should try on the clothes she purchased for him.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Weinstein told Ms. Croft that as a producer for the show Project Runway, he "really knew" clothes and could tell when things "fit properly."

76. Although confused by the request, Ms. Croft was extremely intimidated by Weinstein. As Ms. Croft began to take her shopping bags to the bathroom in the living room area of the suite, Weinstein stopped her, telling her to try on the clothes "out here," insisting that "that's how we do it here."

77. Ms. Croft explained that she was not comfortable with changing in front of him and proceeded to the bathroom. Weinstein appeared amused at Ms. Croft's protestations.

78. After trying on some clothes, Ms. Croft returned to the couch to discuss the work opportunity Weinstein had mentioned. Weinstein handed Ms. Croft a drink, but she only took a sip or two, wanting to focus instead of the potential business opportunity.

79. Weinstein was extremely complementary towards Ms. Croft, noting that she reminded him of actress Reese Witherspoon.

## V. Weinstein Sexually Assaults Ms. Croft and Ms. Croft Immediately Reports the Assault to Dolan

80. As the conversation turned to massage therapy, Weinstein asked Ms. Croft if she could "show [him] what she could do" and requested that she give him a massage. Ms. Croft immediately dismissed the request, noting that she was very particular about only performing massages properly using her massage table.

81. Around this time, Weinstein came behind Ms. Croft on the couch and began rubbing her shoulders, again requesting that she massage him. Uncomfortable, Ms. Croft again stated she would not perform any massage without the proper set up.

82. Weinstein then excused himself to go to the bathroom. When he returned to the living room area of the suite, he was wearing a loosely tied bathrobe and appeared to be naked



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

underneath the bathrobe. While standing mostly unclothed in front of Ms. Croft, he asked her, "so, when are you going to give me a massage?"

83. Ms. Croft was terrified and panicked. She immediately tried to figure out a way to avoid the escalating situation. She reiterated that it was very important to have her massage table, especially for someone with a "greater stature" like Weinstein. Frantic to avoid what Weinstein was requesting, she also suggested that she would need permission from the Eagles to perform any other massages, as she was brought out to Los Angeles for them specifically.

84. Weinstein was unfazed by Ms. Croft's attempts to get away and asked her to look at the bed in the bedroom of the suite because it was "perfect" for a massage.

85. When Ms. Croft again said she was not comfortable with the situation, Weinstein began to get irritated and angry with her. He stated, "well this is just how people do things in Hollywood, if you will not be reasonable and are not able to handle requests on the fly, you won't make it in Hollywood."

86. Ms. Croft agreed to look at the bed, but again assured Weinstein that the bed would not work for a massage, and that she really needed her table and for his body to be draped with a sheet or blanket. Weinstein became very angry, stating that Ms. Croft could easily massage him on the bed and that he liked to be completely naked.

87. Ms. Croft tried to leave the room, but Weinstein blocked the door to prevent her from leaving. Terrified and desperate, Ms. Croft tried one last attempt to avoid Weinstein, stating that she felt "so lucky to have the opportunity to work on" Weinstein and wanted to make sure that it was done correctly so that she could show him what she is capable of. Weinstein reluctantly agreed and allowed Ms. Croft to exit the suite.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

88. Ms. Croft hurried down the hallway to her hotel room, but as she left, she realized that Weinstein had followed her out of his suite down the hallway. He was still only wearing a loosely tied bathrobe.

89. Ms. Croft arrived at her room and rushed inside. Once inside, Ms. Croft attempted to push the door closed. As the door closed, though, Weinstein stuck his foot in the opening of the door and pushed the door open. He barged into Ms. Croft's hotel room.

90. Weinstein then backed Ms. Croft onto the bed, forced her down, and forced her legs open. Standing between her legs, he undid his robe, and shoved his fingers inside of her, using his other hand to hold her down. He tried to force his penis inside of her, although he struggled to do so.

91. Ms. Croft fought back the best she could, although she recalls that Weinstein felt like a giant compared to her. She struggled to sit up, push him away, and tried as hard as she could to keep her legs together.

92. In the midst of the assault, Ms. Croft's hotel room phone began to ring. She tried to use the phone as an excuse to escape, stating "that's probably Jim Dolan calling me, he is going to come down here if I don't answer his call."

93. Ms. Croft managed to wriggle away enough to grab the phone, and discovered that it was, in fact, Dolan calling her. She picked up the call and told Dolan that she would be with him shortly.

94. After hearing her speak to Dolan, Weinstein backed off of Ms. Croft. He then stated to her, "well, you know Jim and I are best friends. He's going to be very disappointed that you led me on, this won't look good for you." Weinstein then left Ms. Croft's hotel room.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

95. Rattled and shaken, Ms. Croft went to Dolan's hotel room. She was visibly upset, and Dolan inquired what was wrong.

96. In response, Ms. Croft told Dolan that she had met Weinstein in the elevator lobby, had joined him for a discussion, and that Weinstein was "sexually aggressive" with her.

97. Dolan was not at all surprised by the fact that Ms. Croft had "randomly" happened to meet one of his "best friends" at the hotel. Nor, incredibly, did Dolan express any surprise at the news that Weinstein was "sexually aggressive" with Ms. Croft. To the contrary, Dolan responded to Ms. Croft's report of sexual assault in a completely matter-of-fact tone, noting that Weinstein was "a troubled person" that had a lot of "serious issues," but that his friends were "trying to get him to address" those issues. Dolan intimated that Weinstein was not a "safe" person but did little to console Ms. Croft or help her to report the assault to the authorities. Indeed, with his comments, Ms. Croft felt that Dolan completely dismissed the gravity of the situation and did not truly care about what his friend had done to her.

98. The day after the attack, Ms. Croft attempted to work but felt so physically and emotionally unwell that Robbins, the executive from the Azoff Entities, sent a doctor to see her. In the following days, Ms. Croft felt so physically and emotionally unwell that she called out sick from work. She found herself unable to leave her hotel room, wracked with shame and disgust, and completely isolated. Dolan was aware that Ms. Croft was unwell after Weinstein's horrific attack.

99. Ms. Croft left the tour after the Los Angeles concerts heartbroken and traumatized.

## VI. Ms. Croft Suffers Following Dolan's Exploitation and Manipulation and Weinstein's Horrific Sexual Attack

100. Ms. Croft was never the same after her experiences on tour with the Eagles.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

101. When she returned home to Tennessee, her friends and family noticed that she was no longer as happy and energetic as she used to be.

102. Moreover, she lost her passion and love for massage therapy—a practice she had previously devoted her life to. When she had scheduled massage appointments with clients following the tour, she would often have panic attacks leading up to the appointment. On multiple occasions, just before starting a massage, Ms. Croft's muscles would tense so extremely that she could not move her hands or perform a massage. On these occasions, she would retreat to an empty room where she would cry and shake until she could call her parents to pick her up.

103. To cope with the incessant stress and horrific memories of the tour, Ms. Croft turned to drugs and alcohol to forget about the assault and to assuage her feelings of shame and guilt for getting roped into Dolan's manipulations. Her substance use turned into abuse, and she later required extensive rehabilitation to cope with her depression and the related substance use.

104. Weinstein's assault and Dolan's unlawful sexual batteries and manipulation—both together and separately—weighed on Ms. Croft for years. She struggled to form healthy relationships with men, as she felt betrayed by her trusting nature, believing it led Dolan to take advantage of her and allowed Weinstein to attack her.

105. Tragically, Ms. Croft has since abandoned her lifelong love of massage therapy. She is unable to engage in the healing physical practice that she cared so deeply for, as now it carries all of the pain and devastation caused by Dolan and Weinstein.

**FIRST CAUSE OF ACTION**
**(Sexual Battery)**
***Against James Dolan***

106. Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

107. Defendant James Dolan committed a battery against Plaintiff when he intentionally engaged in unlawful, intentional, and offensive touching or application of force to Plaintiff's person, where Plaintiff did not act freely and voluntarily with knowledge of the nature of the transactions involved, and the actions were against Plaintiff's will, as defined in Cal. Penal Code § 243.4.

108. As a result of Dolan's alleged conduct, Plaintiff has suffered physical injury, severe emotional distress, humiliation, embarrassment, anxiety, economic harm, and other consequential damages.

109. The conduct of Dolan described above was willful, wanton, and malicious. At all relevant times, Dolan acted with conscious disregard of Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury, and/or pain and suffering to Plaintiff. By virtue of the foregoing, Plaintiff is entitled to recover punitive and exemplary damages from James Dolan according to proof at trial.

110. This cause of action is timely under California's Sexual Abuse and Cover-Up Accountability Act, AB 2777 because it is "based on conduct that occurred on or after January 1, 2009, and is commenced [] after January 1, 2019," and is thereby revived by Cal. Code Civ. Proc. § 340.16 (b)(3).



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**SECOND CAUSE OF ACTION**
**(Sexual Assault/Attempted Rape)**
***Against Harvey Weinstein***

111. Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

112. Defendant Harvey Weinstein committed an assault and battery against Plaintiff because he intentionally engaged in unlawful, intentional, and offensive touching or application of force to Plaintiff's person, as defined in Cal. Penal Code §§ 243.4 and 261.

113. As a result of Harvey Weinstein's alleged conduct, Plaintiff has suffered physical injury, severe emotional distress, humiliation, embarrassment, anxiety, economic harm, and other consequential damages.

114. The conduct of Harvey Weinstein described above was willful, wanton, and malicious. At all relevant times, Harvey Weinstein acted with conscious disregard of Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury, and/or pain and suffering to Plaintiff. By virtue of the foregoing, Plaintiff is entitled to recover punitive and exemplary damages from Harvey Weinstein according to proof at trial.

115. This cause of action is timely under California's Sexual Abuse and Cover-Up Accountability Act, AB 2777 because it is "based on conduct that occurred on or after January 1, 2009, and is commenced []after January 1, 2019," and is thereby revived by Cal. Code Civ. Proc. § 340.16 (b)(3).



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**THIRD CAUSE OF ACTION**
**(Aiding and Abetting Sexual Assault/Attempted Rape)**
***Against James Dolan***

116. Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

117. Defendant James Dolan aided, abetted, advised, encouraged, enabled, and facilitated Defendant Harvey Weinstein's battery and assault of Plaintiff by orchestrating and facilitating a meeting between Weinstein and Plaintiff for the purposes of Weinstein engaging in sex acts with Plaintiff, and Weinstein did in fact intentionally engage in unlawful, intentional, and offensive touching or application of force to Plaintiff's person, as defined in Cal. Penal Code §§ 243.4 and 261.

118. As a result of James Dolan's alleged conduct in aiding and abetting Weinstein's criminal acts, Plaintiff has suffered physical injury, severe emotional distress, humiliation, embarrassment, anxiety, economic harm, and other consequential damages.

119. The conduct of James Dolan described above was willful, wanton, and malicious. At all relevant times, James Dolan acted with conscious disregard of Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury, and/or pain and suffering to Plaintiff. By virtue of the foregoing, Plaintiff is entitled to recover punitive and exemplary damages from James Dolan according to proof at trial.

120. This cause of action is timely under California's Sexual Abuse and Cover-Up Accountability Act, AB 2777 because it is "based on conduct that occurred on or after January 1, 2009, and is commenced []after January 1, 2019," and is thereby revived by Cal. Code Civ. Proc. § 340.16 (b)(3).



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

121. In or about March 2018, Harvey Weinstein's company, The Weinstein Company ("TWC"), filed bankruptcy proceedings. Those proceedings ultimately resulted in the liquidation of TWC and a plan of liquidation that was confirmed by the bankruptcy court. Although Dolan was not a debtor in those proceedings, as part of TWC's plan of liquidation, Dolan (and other former and current TWC board members) received a purported release from any claims against him arising from Weinstein's misconduct, including claims by individuals who did not participate in the TWC bankruptcy proceeding, who did not consent to the release of any claims, and who received no consideration for any release. This type of release is sometimes referred to as a "non-consensual third-party release."

122. Ms. Croft did not participate in the TWC bankruptcy proceedings, she did not consent to release any claim against Dolan (or anyone else), and she received no consideration for any release granted to Dolan in the TWC proceeding.

123. Following the bankruptcy court's confirmation of the TWC plan of liquidation, including the non-consensual third-party release in favor of Dolan, the United State Supreme Court held that bankruptcy courts lack legal authority to issue non-consensual third-party releases. *See Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024). In light of that binding precedent, the bankruptcy court that confirmed the TWC plan liquidation had no legal authority to grant a non-consensual third-party release in favor of Dolan. That release is thus unenforceable by Dolan against Croft.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays judgment be entered in her favor against Defendants, and each of them, as follows:



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

1. For a money judgment representing compensatory damages including consequential damages, lost wages, earning, and all other sums of money, together with interest on these amounts, according to proof;

2. For an award of money judgment for mental pain and anguish and severe emotional distress, according to proof;

3. For punitive and exemplary damages according to proof;

4. For attorneys' fees and costs;

5. For prejudgment and post-judgment interest; and

6. For such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: September 18, 2026
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: ______________________
Douglas H. Wigdor
Meredith A. Firetog

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
mfiretog@wigdorlaw.com

**LAW OFFICE OF KEVIN MINTZER, P.C.**

Kevin Mintzer
Laura L. Koistinen
1350 Broadway, Suite 1410
New York, New York 10018



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Telephone: (646) 843-8180
km@mintzerfirm.com
llk@mintzerfirm.com

*Counsel for Plaintiff Kellye Croft*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**VERIFICATION**

I, Kellye Croft, affirm under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, have read the foregoing verified complaint and know the contents thereof. The same are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

Dated: September 14, 2026
New York, New York

By: Signed by: Kellye Croft
C1D82FD29CFE497...
Kellye Croft



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.